E. J. SEABROOK, Sr., and Edith Seabrook, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

H. J. SEABROOK and Gertrude Seabrook, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. Nos. 65–139, 65–140.

United States District Court
W. D. Oklahoma.

April 25, 1966.

---

Jack High, of Tomerlin & High, Oklahoma City, Okl., for plaintiffs.

B. Andrew Potter, U. S. Dist. Atty., John W. Raley, Jr., Asst. U. S. Atty., Oklahoma City, Okl., and John O. Jones, Atty., Tax Div., Department of Justice, Fort Worth, Tex., for defendant.

BOHANON, District Judge.

This cause came on regularly for hearing on December 15, 1965, plaintiff being represented by Jack High, of the firm of Tomerlin & High, Oklahoma City, Oklahoma, and the defendant being represented by B. Andrew Potter, United States District Attorney, Oklahoma City, Oklahoma, and John O. Jones, Attorney, Tax Division, Department of Justice, Fort Worth, Texas. Plaintiff introduced its oral testimony and exhibits, and rested. Thereafter the defendant introduced its oral testimony and exhibits and rested.

The parties, plaintiff and defendant, did on the 15th day of December, 1965, file their Stipulation or agreement as to many of the facts in this case, and the Court adopts the facts as stipulated and agreed to between the parties, and hereinafter sets out such agreed to facts as the Findings of the Court:

1. The captioned cases having been consolidated for trial by Order of the Court, it is hereby stipulated and agreed by and between the Plaintiffs and Defendant in each of said cases as to the following statement of facts:

2. H. J. Seabrook and E. J. Seabrook, Sr., are brothers. From 1939 to 1949, the brothers were operating a partnership known as Mechanics Coverall Supply Company in Oklahoma City, Oklahoma. This partnership was engaged in the industrial laundry business.

3. In 1946, the brothers formed a partnership with E. G. Norman and William Behring, conducting the same type of business in Wichita, Kansas, known as United Coverall Supply Co. Each of the four partners owned an equal interest in this business. E. G. Norman and William Behring are both sons-in-law of E. J. Seabrook, Sr.

4. In 1947, a corporation was organized and chartered in the State of Kansas under the name of United Coverall Supply Co., Inc., hereinafter sometimes referred to as "Corporation," with a total authorized capital stock of $10,000, divided into 100 shares of common stock with par value of $100 per share. The four equal partners transferred all of the assets of the partnership to the corporation and were each issued 25 shares of stock for their interest in the partnership.

5. The two brothers continued their partnership in Oklahoma City, Oklahoma, known as Mechanics Coverall Supply Company, until 1949.

6. In 1949, the authorized capital stock of United Coverall Supply Co., Inc., was increased to $50,000, divided as follows: 25,000 shares of common stock with par value of $1 per share, and 25,000 shares of 6% preferred stock with par value of $1 per share. Prior to the issuance of any of the preferred stock, and

in 1950, the following additional preferences and special rights were made applicable to the preferred stock. The preferred stock, when issued, was entitled to the same voting rights as the common stock, was preferred as to the 6% dividend over the common stock, and such 6% dividend was cumulative. In any year in which a dividend in excess of 6% was voted on the common stock, the preferred stock was entitled to the same participation as the common stock. The preferred stock was not subject to redemption by the corporation.

7. Between November 30, 1949, and May 8, 1956, all of the common stock and 15,000 shares of the preferred stock was deposited in escrow with the Kansas Corporation Commission in connection with qualifying said stock by registration.

8. Prior to 1949, Charles Prescott and Leroy Brown were operating a partnership known as Western Towel Supply Company, in Amarillo, Texas. This was also an industrial laundry business. Charles Prescott is the son-in-law of H. J. Seabrook. Charles Prescott acquired 3,104 shares of stock in United Coverall Supply Co., Inc., in 1949, by transferring his interest in the Western Towel Supply Company partnership to the corporation.

9. In the same year, 1949, the two brothers, E. J. Seabrook, Sr. and H. J. Seabrook, transferred all of the assets of their partnership known as Mechanics Coverall Supply Company, in Oklahoma City, Oklahoma, to United Coverall Supply Co., Inc., for 32,218 shares of stock in said corporation.

10. In 1949, a stock dividend of 911 shares of preferred stock of the corporation was declared and paid to the stockholders of record as of September 25, 1949, subject to being issued upon the release of such shares held in escrow by the Kansas Corporation Commission. No income tax was paid on the 911 shares of preferred stock issued to H. J. Seabrook, nor on the 911 shares of preferred stock issued to E. J. Seabrook, Sr., as a result of this dividend.

11. On January 30, 1956, the name of the corporation was changed from United Coverall Supply Co., Inc., to Western Towel and Uniform Supply, Inc., and on April 24, 1956, the name of the corporation was again changed from Western Towel and Uniform Supply, Inc., to Western Uniform & Towel Service, Inc., the name under which the corporation has continued to the present date.

12. The five principal stockholders, namely: E. J. Seabrook, Sr., H. J. Seabrook, E. J. Seabrook, Jr., Charles Prescott and William Behring, continued as officers and/or employees of the corporation from 1949 through 1962. The other shareholders were employees and owned a comparatively small percent of the stock.

13. United Coverall Supply Co., Inc., now Western Uniform & Towel Service, Inc., continued to expand its business from the date of its reorganization in 1949, to date. The principal place of business from reorganization to date was and is in Oklahoma City, Oklahoma.

14. On June 1, 1960, plaintiff E. J. Seabrook, Sr., offered 12,500 shares of preferred stock, which he owned, to Western Uniform & Towel Service, Inc., for redemption, and said corporation purchased and redeemed the stock from plaintiff and for which plaintiff received $48,000 in cash. Plaintiffs E. J. Seabrook, Sr., and Edith Seabrook claimed that the $48,000 received from the sale of the preferred stock as above noted is a distribution in full payment in exchange for stock under Section 302 of the Internal Revenue Code of 1954, as amended. On plaintiffs' joint Federal Income Tax Return for 1960 (filed in 1961), which said Return was timely filed, the proceeds from the sale of said stock were reported by E. J. Seabrook, Sr., and Edith Seabrook, husband and wife, as a long-term capital gain of $35,500, and E. J. Seabrook, Sr., and Edith Seabrook, his wife, paid as part of their 1960 Federal income tax liability shown to be due on said return, tax on such gain at capital gain rates.

15. On October 1, 1960, plaintiff H. J. Seabrook offered 12,500 shares of preferred stock which he owned to Western Uniform & Towel Service, Inc., for redemption, and said corporation purchased and redeemed the stock from H. J. Seabrook, for which plaintiff received $50,000 in cash. Plaintiffs H. J. Seabrook and Gertrude Seabrook, husband and wife, claimed that the $50,000 received from the sale of the preferred stock as above noted is a distribution in full payment in exchange for stock under Section 302 of the Internal Revenue Code of 1954, as amended. On plaintiffs' joint Federal Income Tax Return for 1960, which said return was timely filed in 1961, the proceeds from the sale of said stock were reported by plaintiffs as a long-term capital gain of $37,500, and plaintiffs H. J. Seabrook and Gertrude Seabrook paid as part of their 1960 Federal Income Tax liability shown to be due on said Return, tax on such gain at capital gain rates.

16. Immediately prior to the redemption of the preferred stock of H. J. Seabrook and E. J. Seabrook, Sr., by the corporation, as above set forth, the issued and outstanding stock of all classes was owned as follows:

### PREFERRED STOCK

| | |
|---|---|
| H. J. Seabrook | 12,500 shares |
| E. J. Seabrook, Sr. | 12,500 shares |
| TOTAL OUTSTANDING PREFERRED STOCK | 25,000 shares |

### COMMON STOCK

| | |
|---|---|
| H. J. Seabrook | 4,949 shares |
| E. J. Seabrook, Sr. | 4,949 shares |
| E. J. Seabrook, Jr. | 3,510 shares |
| Charles Prescott | 3,510 shares |
| William Behring | 3,511 shares |
| Raoul Berthiaume | 270 shares |
| John Wesley | 10 shares |
| George Baker | 10 shares |
| Dale Frederick | 20 shares |
| A. B. Craig | 20 shares |
| James Roark | 10 shares |
| Marvin Bray | 10 shares |
| R. J. Seabrook | 15 shares |
| Eugene Brown | 10 shares |
| Wilton C. Sutton | 15 shares |
| Alvin McDonald | 5 shares |
| TOTAL OUTSTANDING COMMON STOCK | 20,824 shares |
| TOTAL OUTSTANDING COMMON AND PREFERRED | 45,824 shares |

17. Immediately subsequent to the redemption of the preferred stock, the common stock was the only class of stock issued and outstanding and the ownership of such common stock was the same as before the redemption of the preferred stock.

18. The only dividend paid on the common stock from 1947 through 1960 was a 6% common stock dividend paid

in 1950 in the amount of $0.06 per share outstanding. All of the annual dividends on the preferred stock were paid from 1950 to and including the year 1957. No dividends were paid in 1958, 1959, or 1960, on the preferred stock. H. J. Seabrook and E. J. Seabrook, Sr., waived the dividends on their preferred stock for the years 1958 and 1959, and semi-annual payment of the 1960 dividend in connection with the redemption of their preferred stock. The earned surplus of the corporation at the end of the corporation's fiscal year 12–31–58, 12–31–59, and at the time of the redemption in 1960, was sufficient to pay all preferred dividends in arrears and for the redemption of such stock.

19. In reporting the corporate income tax for 1960, the preferred stock was shown by the corporation to be held as treasury stock, but was shown as cancelled by the corporation in fiscal year 1961.

20. Defendant claims that the proceeds from the redemption of the preferred stock of H. J. Seabrook and E. J. Seabrook, Sr., were subject to ordinary income tax, and plaintiffs claim that the proceeds were subject to long-term capital gain treatment. *This is the issue joined before the Court in both cases.*

21. In 1960, at the time of the redemption of the preferred stock, E. J. Seabrook, Sr., was 55 years of age; H. J. Seabrook was 59 years of age; E. J. Seabrook, was 35 years of age; Charles Prescott was 33 years of age; and William Behring was 35 years of age. E. J. Seabrook, Jr., and R. J. Seabrook, two of the common stock owners, are sons of E. J. Seabrook, Sr.

22. On October 7, 1963, the Commissioner of Internal Revenue by letter notified plaintiffs E. J. Seabrook, Sr., and Edith Seabrook that a determination of their income tax liability for the year 1960 disclosed a deficiency in the amount of $18,702.39. On November 1, 1963, plaintiffs filed a consent to immediate assessment, and on the same date paid to the District Director of Internal Revenue in Oklahoma City, Oklahoma, the amount of $18,702.39, being the amount of the alleged deficiency, and on the same date paid the amount of $2,851.47 as interest on said deficiency to date of payment, making a total payment of $21,553.86. On November 29, 1963, a deficiency assessment was made by the Commissioner of Internal Revenue against plaintiffs E. J. Seabrook, Sr., and Edith Seabrook, for tax in the amount of $18,702.39, plus interest of $2,851.47, making a total of $21,553.86.

23. On October 7, 1963, the Commissioner of Internal Revenue by letter notified plaintiffs H. J. Seabrook and Gertrude Seabrook that a determination of their income tax liability for the year 1960 disclosed a deficiency in the amount of $20,572.27. On November 1, 1963, plaintiffs filed a consent to immediate assessment, and on the same date paid to the District Director of Internal Revenue in Oklahoma City, Oklahoma, $20,-572.27, being the amount of the alleged deficiency, and on the same date paid an additional sum of $3,136.56, as interest on said alleged deficiency to date of payment, making a total payment of $23,-708.83. On November 29, 1963, a deficiency assessment was made by the Commissioner of Internal Revenue against plaintiffs H. J. Seabrook and Gertrude Seabrook for tax in the amount of $20,572.27, plus interest of $3,136.56, making a total of $23,708.83.

24. On August 5, 1964, plaintiffs E. J. Seabrook and Edith Seabrook filed with the District Director of Internal Revenue in Oklahoma City, Oklahoma, a claim for refund in the amount of $18,-702.39, representing the amount of additional 1960 income tax assessed and collected as a result of the determination by the Commissioner of Internal Revenue that the $48,000 received for the redemption of the preferred stock was subject to treatment as ordinary income as above set forth; that the claim for refund included a claim for an additional $2,751.47 as interest to date of payment.

25. The tax refund sued for by E. J. Seabrook, Sr., and Edith Seabrook, in the amount of $21,553.86, represents the amount of 1960 income tax attributable to the claim of the defendant that the receipt of the $48,000 for the redemption of the 12,500 shares of preferred stock was equivalent to a dividend, including interest to November 1, 1963. No part of this tax has been refunded or credited to said plaintiffs.

26. The tax refund sued for by H. J. Seabrook and Gertrude Seabrook in the amount of $23,708.83 represents the amount of 1960 income tax attributable to the claim of the defendant that the receipt of the $50,000 for the redemption of the 12,500 shares of preferred stock was equivalent to a dividend, including interest to November 1, 1963. No part of this tax has been refunded or credited to said plaintiffs.

27. A statutory notice of disallowance from the Commissioner of Internal Revenue of the claim for refund of E. J. Seabrook, dated December 15, 1964, was received by said plaintiffs prior to the filing of this action.

28. A statutory notice of disallowance from the Commissioner of Internal Revenue of the claim for refund of H. J. Seabrook, dated December 15, 1964, was received by said plaintiffs prior to the filing of this action.

(STIPULATION SIGNED BY JACK HIGH, Attorney for Plaintiffs, and JOHN O. JONES, Attorney for Defendant.)

In addition, the Court makes the following Findings of Fact:

29. Prior to the issuance of any of the preferred stock, and in 1950, the following additional preferences and special rights were made applicable to the preferred stock: The preferred stock, when issued, was entitled to the same voting rights as the common stock, was preferred as to the 6% dividend over the common stock, and such 6% dividend was cumulative. In any year in which a dividend in excess of 6% was voted on the common stock, the preferred stock was entitled to the same participation as the common stock. The preferred stock was not subject to redemption by the Corporation.

30. In the month of December, 1959, the five principal shareholders held a series of meetings in Oklahoma City, Oklahoma. During these meetings, they reached an agreement as to a plan for the redemption of all of the issued and outstanding preferred stock of the Corporation. As a part of this plan to redeem all of the outstanding preferred stock of the Corporation, which was then owned by Taxpayer and E. J. Seabrook, Sr., and H. J. Seabrook, other decisions were reached involving management and control of the Corporation. The plan agreed upon by the five principal shareholders at these meetings incorporated the following decisions:

(a) The Corporation was to redeem 12,500 shares of preferred stock from Taxpayer H. J. Seabrook for $50,000, and was to redeem 12,500 shares of preferred stock from E. J. Seabrook, Sr., for $48,000.

(b) The three younger shareholders, Charles Prescott, William Behring, and E. J. Seabrook, Jr., were to take over as soon as possible the day to day active management and control of the corporate business, and the two elder Seabrooks, H. J. Seabrook and E. J. Seabrook, Sr., were to retire from the active management and control of the corporate affairs but were to remain with the Corporation in an advisory capacity.

APPLICABLE TESTS TO DETERMINE NET EFFECT OF TRANSACTION:

31. That the redemption of the preferred stock of H. J. Seabrook and E. J. Seabrook, Sr., by the Corporation, although consummated 4 months apart, was a single transaction, based upon the agreement of the 5 principal shareholders in December, 1959; that the reason the preferred stock of the two brothers was not redeemed at the same time was lack of available cash in the Corporation.

32. The redemption of said shareholders' preferred stock was not pro rata among the shareholders since the relative stock interests of the shareholders immediately subsequent to the redemption of the preferred stock was changed.

33. That as a result of the redemption of their preferred stock, there was a significant reduction in the stock interests in the Corporation of Taxpayer, H. J. Seabrook and E. J. Seabrook, Sr., and this is so regardless of whether the rule of attribution under Section 318(a) of the Internal Revenue Code of 1954 as amended is applied or is not applied.

34. The reduction of the stock ownership in the Corporation of the Taxpayer and E. J. Seabrook, Sr., and H. J. Seabrook, as a result of such redemptions, considered both individually and collectively, and calculated both with and without applying the rule under Section 318(a), is as follows:

Calculated without applying Section 318(a):

|  | H. J. Seabrook | E. J. Seabrook, Sr. | Collectively |
|---|---|---|---|
| Prior to Redemption | 38.08% | 38.08% | 76.16% |
| Subsequent to Redemption | 23.77% | 23.77% | 47.53% |
| Reduction | 14.31% | 14.31% | 28.63% |

Calculated applying Section 318(a):

|  | H. J. Seabrook | E. J. Seabrook, Sr. | Collectively |
|---|---|---|---|
| Prior to Redemption | 38.08% | 45.77% | 83.85% |
| Subsequent to Redemption | 23.77% | 40.69% | 64.46% |
| Reduction | 14.31% | 5.08% | 19.39% |

35. That the redemption of the preferred stock of Taxpayers by the Corporation did not result in identical payments to all of the shareholders; that Taxpayers received all of the proceeds of the redemption and the other 14 shareholders received nothing. The Court finds that had the $98,000 redemption money been distributed as a dividend to the stockholders of record it would have been divided substantially as follows:

| H. J. Seabrook | $37,340.86 |
|---|---|
| E. J. Seabrook, Sr. | 37,340.86 |
| E. J. Seabrook, Jr. | 7,511.40 |
| Charles Prescott | 7,511.40 |
| William Behring | 7,513.54 |
| The Other 11 Shareholders | 845.30 |
|  | $98,063.36 |

36. The redemption of the preferred stock of the Taxpayers by the Corporation significantly altered the rights of the shareholders in respect to their participation in any future liquidation or dissolution of the Corporation. In view of the history of rapid growth and expansion of the Corporation from the date of its reorganization in 1949, to the present time, the alteration in the rights of Taxpayers to participate in the fruits of such growth were significantly affected.

37. The redemption of the preferred stock of Taxpayers altered their voting control over the Corporation. Prior to the redemption of such preferred stock, Taxpayers collectively owned 76.16% of the voting stock, and had the voting control of the corporation. Subsequent thereto, the percentage of the combined voting stock of said shareholders was 47.53%, which was less than enough for voting control; that prior to the redemption of the preferred stock of Taxpayers, the three younger shareholders, Charles Prescott, William Behring, and E. J. Seabrook, Jr., owned 22.98% of the voting control of the Corporation. Subsequent thereto, these three younger share-

holders owned 50.57% of the voting control of the Corporation.

38. In January, 1960, in pursuance of the plan, the two elder Seabrooks (Taxpayers) sent a letter to all of the employees of the Corporation informing them that E. J. Seabrook, Jr., had been appointed General Manager of the entire operation and that the two elder Seabrooks were stepping down and letting the younger generation take over the active management of the business; that they were not retiring altogether, but would be around in an advisory and consultative capacity. Prior to 1960, H. J. Seabrook managed and controlled the business on a day-to-day basis. Commencing in 1960, Taxpayers took no part in the actual day-to-day management and control of the business. Prior to 1960, Taxpayers were in charge of salesmen's and managers' meetings. Commencing in 1960, Taxpayers attended some of the meetings. Prior to 1960, Taxpayers carried out the policies of the Corporation and sent policy directions to the Managers. Commencing in 1960, they did not send out any of these policy directions, but such policy directions were sent out by E. J. Seabrook, Jr. Although Taxpayers remained as principal officers and members of the Board of Directors during 1960 and a number of years thereafter, it was by the grace of the control of the company. The record shows that one of the Taxpayers continued to receive from the Corporation a substantial salary in the approximate amount of $26,000 per year, and the other Taxpayer continued to receive a similar salary from another Corporation, and the Court finds no authority, rule, or statutory guide to the effect that salaries paid are in any sense controlling, and the Court here specifically finds that the monies paid by the Corporation to its stockholders in redemption of stock should not be treated as ordinary income, and the defendant's claim in this regard is rejected.

39. The Court finds that the plaintiffs H. J. Seabrook and Gertrude Seabrook are entitled to judgment against the defendant in the sum of $23,708.83,

together with interest thereon at the rate of six per cent per annum from November 1, 1963, until paid.

40. The Court finds that the plaintiffs E. J. Seabrook, Sr., and Edith Seabrook are entitled to a judgment against the defendant in the amount of $21,-553.86, together with interest thereon at the rate of six per cent per annum from November 29, 1963, until paid.

### Conclusions of Law

1. The Court feels it would be helpful to quote from the United States Senate's report of the legislative action to permit corporations to redeem stock without the stockholder paying ordinary income or dividend income rates. The following quotes are found in U. S. Code Congressional and Administrative News, 83rd Congress, Second Session, 1954, Pages 4870 and 4871:

"§ 302. Distributions in redemption of stock. Section 302 corresponds in function to section 302 of the House bill and relates to section 115(c), (g), and (i) of the 1939 Code. Under this section, rules are prescribed for the tax treatment to shareholders receiving distributions of property in redemption of stock. As under section 302 of the House bill, distributions in redemption of stock which qualify as distributions in complete or partial liquidations under part II of subchapter C are not within the scope of section 302. Unlike the House bill, however, section 302 does not provide specific statutory guides governing the tax consequences of every stock redemption. In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry. For special rules relating to the redemption of section 306 stock, see the discussion under section 306. * * *

"Subsection (b) of section 302 states three conditions in paragraphs (1), (2), (3), and (4), the satisfaction of any one of which will result in the treatment of the redemption as a distribution in full or part payment in exchange for the stock. In general, under this subsection your committee intends to incorporate into the bill existing law as to whether or not a reduction is essentially equivalent to a dividend under section 115(g) (1) of the 1939 Code, and in addition to provide three definite standards in order to provide certainty in specific instances. * * *

"Paragraph (1) of subsection (b) provides that subsection (a) will apply if the redemption is not essentially equivalent to a dividend.

"The test intended to be incorporated in the interpretation of paragraph (1) is in general that currently employed under section 115(g) (1) of the 1939 Code. Your committee further intends that in applying this test for the future that the inquiry will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation. * * *

"Paragraph (2) of subsection (b) sets forth a general rule that if the redemption is substantially disproportionate, it will be treated as a sale under subsection (a), if the other conditions described in the paragraph are met. It is intended that the general rules shall apply with respect to a redemption of preferred stock (other than section 306 stock) as well as common stock.

"However, subparagraph (B) limits the application of paragraph (2) by providing that the general rule shall not apply unless immediately after the redemption the shareholder owns less than 50 percent of the total combined voting power of all classes of stock entitled to vote.

"Subparagraph (C) of paragraph (2) defines the term 'substantially disproportionate.' It is provided that a distribution will be substantially disproportionate with respect to a shareholder only if, the ratio which the voting stock owned by the shareholder after the redemption bears to all the voting stock of the corporation at such time, is less than 80 percent of the ratio which the voting stock owned by the shareholder immediately before the redemption bears to all the voting stock of the corporation at such time. In addition, in order that a distribution may qualify as 'substantially disproportionate' it is necessary that the shareholder's ownership of voting or nonvoting common stock (that is, his participating interest) in the corporation also be reduced by the percentage required with respect to voting stock. * * * *"

2. Under the law, as developed by the Courts, the so-called "net effect test" is the primary consideration in determining dividend equivalence within the meaning of Section 302(b) (1) of the Internal Revenue Code of 1954, as amended. The net effect test, as strictly applied by some Courts, involves a determination of whether, considering all the factors and circumstances immediately before the redemption of the stock and immediately subsequent thereto, the transaction is or is not essentially equivalent to a dividend. The net effect test, as more flexibly applied by other Courts, involves, in addition to the strict net effect test, a consideration of whether or not there was a legitimate business purpose for the redemption of the stock.

3. The net effect test in essence holds that if all the circumstances show that the redemption does not, as a practical matter, change the essential relationship between the shareholders and the corporation, then the distribution is essentially a taxable dividend.

4. That in determining the net effect of a redemption of stock in respect to dividend equivalence, certain criteria, or tests, may be considered, among which are the following:

(a) Did the redemption of Taxpayer's preferred stock by the corpora-

tion result in a pro rata distribution of profits and earnings to all of the shareholders?

The answer is "No."

(b) Was there a significant reduction in the stock ownership of Taxpayers as a result of the redemption of their preferred stock by the corporation?

The answer is "Yes."

(c) Would the same shareholders have received the identical payments had the redemption been a dividend?

The answer is "No."

(d) Did the redemption of Taxpayer's stock alter shareholders' respective rights to future earnings of the corporation?

The answer is "Yes."

(e) Was there an alteration of the rights of shareholders to participate in a future liquidation or dissolution of the corporation?

The answer is "Yes."

(f) Was there a change in the voting control of the corporation as a result of the redemption of Taxpayer's preferred stock?

The answer is "Yes."

(g) Was there a contraction of the corporate business at the time of the redemption of Taxpayer's preferred stock?

The answer is "No," but an increase in business.

(h) At the time of the redemption of Taxpayer's preferred stock, was there a history of payment of dividends by the corporation?

The answer is "Yes," to preferred stockholders.

(i) Was there a sufficient accumulation of earned surplus to cover the distribution at the time of the redemption of Taxpayer's preferred stock?

The answer is "Yes."

(j) Was there a legitimate business purpose for the redemption of Taxpayer's preferred stock?

The answer is "Yes."

5. That accordingly, the Court concludes that under the evidence and as a matter of law and fact, judgment in this case should be entered in behalf of plaintiffs and against the defendant.